IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 14, 2005 Session

# KENNY VAUGHN, ET AL. v. NOTIE L. CUNNINGHAM, ET AL.

**Appeal from the Circuit Court for Hamilton County**
**No. 97C2650     Samuel H. Payne, Judge**

---

### No. E2004-03001-COA-R3-CV - FILED JANUARY 4, 2006

---

Kenny Vaughn and Barbara Vaughn ("Plaintiffs" or "Mr. Vaughn" and "Mrs. Vaughn" as appropriate) sued Notie L. Cunningham and John Doe concerning an automobile accident that occurred in Hamilton County. The case was tried before a jury and the Trial Court entered judgment on the jury's verdict. The jury found John Doe 100% at fault for the accident, but awarded Plaintiffs no damages. Plaintiffs appeal to this Court claiming that the jury verdict is contrary to the evidence because the amount of damages is not within the range of reasonableness, and that the Trial Court erred by not granting a new trial and by awarding court costs against Plaintiffs. We affirm as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed as Modified; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

J. Taylor Walker and Thomas H. O'Neal, Chattanooga, Tennessee for the Appellants, Kenny Vaughn and wife, Barbara Vaughn.

Angela Cirina Kopet and Christine M. Vanasse, Chattanooga, Tennessee for the Appellee, Notie L. Cunningham.

Scott M. Shaw, Chattanooga, Tennessee for the Appellee, John Doe.

# OPINION

## Background

Due to the nature of the issues raised on appeal, we discuss the facts of this case in some detail. The accident ("the Accident") occurred on December 20, 1996, on Rossville Boulevard in Hamilton County. Plaintiffs filed suit in December of 1997, and the case was tried before a jury in October of 2004.

Mr. Vaughn testified at trial about the Accident. He testified that he was sitting at a red light on Rossville Boulevard behind several other vehicles with his foot on the brake when "I heard tires squealing where - - you know, where they locked up their brakes, what I figured.… Well, I was hit before I could do anything. I didn't - - you know, I didn't have time to really do anything." Mr. Vaughn testified that the 1994 Ford F-250 truck he was driving was knocked six or seven feet forward and stated: "Well, I was sitting right up again the one that was in front of me. I thought I was going to slap it, too, but I didn't." Mr. Vaughn testified that he sat in his vehicle for a few seconds before getting out, and then the light changed and the vehicles ahead of him pulled away. He testified that Ms. Cunningham, whose car had hit him, came up to him and asked where the white car went.

Ms. Cunningham also testified about the Accident. Ms. Cunningham testified she was driving a 1989 Pontiac LeMans hatch-back and that she came to a complete stop at the red light behind Mr. Vaughn's vehicle. She testified that there was approximately three or four feet between her vehicle and Mr. Vaughn's truck after they both stopped at the red light prior to the Accident. Ms. Cunningham testified she heard a car, looked in her rear-view mirror, and saw a white car. She testified that the white car hit her and pushed her car forward into Mr. Vaughn's vehicle. She described the impact as "[j]ust enough to push me into the back [of Mr. Vaughn's truck]." Ms. Cunningham testified that she had a Coke next to her and that after impact, she reached to turn the Coke upright, and then turned her vehicle off and got out. Ms. Cunningham testified that after she got out of her car, she looked for the white car, but did not see it. She testified that she approached Mr. Vaughn who by then was out of his vehicle and asked him where the white car went.

Ms. Cunningham testified that she was not injured in the accident. She testified that the cover over the blinker light on the driver's side of her car was broken, but there was no damage to the front of her bumper. She testified she looked and saw a "streak of white paint on the back bumper …" of her vehicle that had not been there prior to the Accident. Ms. Cunningham testified that she repaired the damage to her car by purchasing a blinker light cover at a junk yard for approximately $4. She described the damage to Mr. Vaughn's vehicle stating the "bumper was completely turned under." She also testified that "it wasn't a bad accident."

Officer Michael T. Short, who was employed by the Chattanooga Police Department, investigated the accident. Officer Short testified that no injuries were reported at scene of the

Accident and that and none of the vehicles involved needed to be towed. Officer Short further testified that he saw a white mark on the rear bumper of Ms. Cunningham's car.

Marcus Wayne Black witnessed the Accident and testified. Mr. Black testified that he was moving furniture for his employer and was outside in front of a building and was facing Rossville Boulevard when the Accident occurred. He testified:

> I heard tires screeching and looked up and there was two vehicles stopped at the red light and a third slid into the rear vehicle. And then he backed up to the right and made a right at the red light and proceeded on. He never stopped after he hit the car.

Mr. Black testified that the white car "hit pretty hard. He busted his radiator and there was antifreeze pouring out of it when he backed up and left." Mr. Black testified that there was a couple of feet distance between Ms. Cunningham's car and Mr. Vaughn's truck as they were stopped at the light before the accident. When asked about the weather conditions at the time of the Accident, Mr. Black stated: "I believe the sun was shining. I don't believe it had been raining. I believe it was a cool day, but pretty nice. It was in December." When asked why he did not go to the assistance of anyone involved in the Accident, Mr. Black stated: "I didn't figure there was nobody seriously injured. I mean, it wasn't that bad of a wreck."

Mr. Vaughn testified that he did not feel hurt at the Accident site and that later that day, he left for a previously scheduled hunting trip. He testified that his neck started getting sore several hours after the Accident. Mr. Vaughn testified that he did not get to hunt that weekend because he was too sore. He testified that the next week "I was sore. Real sore." He stated: "I figured it was just soreness, you know. I figured it would probably take care of itself, go away, but it kept getting worse and worse." Mr. Vaughn testified that over the course of a week and a half or two weeks, the pain kept getting worse, so he called Dr. Dyer, an orthopedic surgeon, and got an appointment. Mr. Vaughn testified that he had to wait a couple of weeks to see Dr. Dyer. Mr. Vaughn saw Dr. Dyer on February 5, 1997, 46 days after the Accident.

Mr. Vaughn, who was 58 years old at the time of trial, testified that he owns Vaughn Equipment and that he repairs all types of mid-size equipment including such things as farm tractors, dozers, and backhoes. When asked to describe his work, Mr. Vaughn stated: "Well, you pretty much have to be almost like an acrobat, you know. You have got to get to every point of the machine to work on it, take bolts out and put them back and repair whatever is wrong with them when it's apart." Mr. Vaughn opened Vaughn Equipment in 1991 or 1992, after he quit his job at Swope Equipment due to a lower back problem that Mr. Vaughn testified made him unable to do the work at Swope Equipment.

Mr. Vaughn testified that he hurt his back in 1989 in a work-related injury ("workers' comp injury"). Mr. Vaughn admitted that he never completely recovered from the workers' comp injury and that he still was taking medication for it, but stated he was not missing work because of that injury. He testified that the last time he saw a doctor for the workers' comp injury was

approximately one year before the Accident. He further testified that the workers' comp injury involved "hurting right in under my shoulder blade and in my mid back, but not nothing any higher." In this suit, Mr. Vaughn claims damages for injury to his neck.

Mr. Vaughn testified that he has seen Dr. Dyer almost every month since the Accident. He stated that Dr. Dyer "give me some different medicine, for one thing, and then - - ... - - he started doing some shots and other stuff that - - and it didn't help. He prescribed me a harness for my head that I use. And sometimes it helps and sometimes it don't." Mr. Vaughn explained that the harness is a traction unit that he wears for an hour, or an hour and a half at a time while sitting at home. Mr. Vaughn also testified that he does some exercises at home for 30 or 40 minutes every evening. Mr. Vaughn testified that Dr. Dyer also prescribed physical therapy. However, Mr. Vaughn testified that he only went to physical therapy two or three times because his neck would get too sore from the therapy. Mr. Vaughn further testified that he had two epidural shots "in the joints in your neck." He testified that the epidural shots helped for two or three days and then would stop working or wear off.

Regarding his work, Mr. Vaughn testified: "Well, there is days that I can go in and I can do fair. And then there is days I go in, I can't do near as much. And there is days that I go in I don't do anything. I sit around." He stated:

> Well, anything that you lift that's, say, 30, 40 pound or more, it puts strain on it and it makes it get sore. And, of course, that's probably the reason some days I'm a lot worse than others, because it aggravates it.…Well, you take if you have got a wrench that you have got to break a bolt loose, you are putting so much strain on it like, of course, it aggravates it. And there is a lot of days that, if I'm doing a job, I have to take pain pills and go on and get it done.

Mr. Vaughn testified that when his neck bothers him at work, all he can do is take pain medication.

Mr. Vaughn testified that before the Accident, he was taking home approximately $500 per week and stated: "Well, if you want to be honest about it, I lose a lot more than that, because I was making 40 dollars an hour." Mr. Vaughn claimed he lost that amount of money for fourteen weeks. He testified that his wife, who is the bookkeeper for his business, prepared a list of the time he lost from work. Mr. Vaughn testified that he lost 14 weeks of work from March of 1997, through November of 1997, at $500 per week for an approximate total of $7,000. Mr. Vaughn further testified that when he goes to the doctor, he is away from work and stated: "Anybody that ever went to a doctor, they know they are gone anywhere from two to four hours. Most of mine average around three." Mr. Vaughn testified he has turned down jobs because he says he can't do them and stated: "Well, when you get down into where you're almost upside down, why, you know, it gets to a point you can't do it, why, you just can't do it." Mr. Vaughn admitted that he had two employees working for him at the time of the Accident and that these employees quit sometime after the Accident. Mr. Vaughn testified that he tried to replace these employees, but was unable to do

so.  Mr. Vaughn then admitted that without suitable employees his shop hasn't been able to make money the way it used to.

In the case at hand, Mr. Vaughn claimed bills for medical care and treatment including the harness, physical therapy charges, an MRI done by Dr. Dyer, and prescription medications.  When asked if his neck has gotten any better, Mr. Vaughn stated: "No.  It's slowly getting worse."  When he was asked how his neck feels currently, Mr. Vaughn stated: "It's sore."  Mr. Vaughn testified that his doctor told him how to modify a creeper that he uses to get underneath machinery at work.  He stated:

> We put a heavier, like a pillow on it, but it didn't do that much good.  Most of the work you do in something like that, you can't keep your head down on something.  You know, you have to reach up and stretch out and everything.  I couldn't - - I couldn't keep my head on a creeper to support it.

Mr. Vaughn testified that his neck injury affects his sleep and that he has had to purchase a special mattress, but it has not helped much.  He stated: "Well, I toss and turn.  There is a lot of nights I don't hardly get any sleep at all."  Mr. Vaughn also testified he has not been able to hunt like he used to because he cannot climb into a tree stand.  He explained that now, he has to use a hunting house on the ground.  Mr. Vaughn testified that he did hunt and kill one deer last year, but his son and friends had to carry the deer back to camp.  Mr. Vaughn also testified that if he is really sore he cannot ride in a four-wheeler because it bounces him too much.  He testified that he now has problems riding or driving in trucks or cars and stated:  "After about 30, 45 mile, why, I start getting, you know, irritation in my neck.  I start hurting."  Mr. Vaughn also testified that he cannot fix his leaking roof, or mow the yard, or use a weed-eater any longer.  He further testified that he can get down on the floor to play with his grandchildren, but not for long periods of time.  Mr. Vaughn testified that his neck is "slowly getting worse.  It's just a matter of time I'm going to have to quit altogether.  I hope I can retire before it happens."

When Mr. Vaughn was questioned regarding damage to his truck from the Accident, he testified that his bumper was turned down in the Accident and that afterward he went to his shop, put a jack under the bumper, and raised it up.  Mr. Vaughn testified that he does not know how much it cost to repair his truck after the Accident because he never saw the bill.  When he was questioned regarding the current value of his truck, Mr. Vaughn testified:

> Well, I gave $24,000 for it.  That's - - that was a straight-out buy.  That's what it listed for.  And today the vehicle is sitting in my garage at the house.  The rotors are rusted up so bad you can't drive it because it hadn't been used because it don't drive right.

* * *

It's almost impossible to [put a value on the truck]. I mean, the vehicle is a $24,000 vehicle. And today, if you can't drive it and keep it from just jumping up and down in the road, what can you say? I mean, it's not worth anything to me. I've done dropped the insurance and the tags on it.

On December 5, 1997, approximately one year after the Accident, Mr. Vaughn was involved in another automobile accident ("the second accident"). Mr. Vaughn testified that he filed a lawsuit regarding the second accident. However, he testified that there are a lot of clerical errors in the complaint for the second accident. When asked if he remembers stating he was unable to go to work for a few days after the second accident, Mr. Vaughn stated that he does not remember. When asked if he remembers stating that when he returned to work after the second accident he was unable to perform his job to some extent due to his injuries, Mr. Vaughn stated: "Again, I don't remember that. All that stuff there, I've not - - I have no refreshment of it. I don't - - I can't remember it."

Mr. Vaughn admitted that the only damage he saw to the front of Ms. Cunningham's vehicle was a broken blinker cover and further admits that he did see a scratch on the rear bumper of her vehicle. Mr. Vaughn testified that he cannot say that a John Doe driver was not involved in the accident and stated: "I really couldn't say, now. I've seen several accidents and stranger things has happened." He further admitted that Ms. Cunningham's car has rubber-covered bumpers. Mr. Vaughn also testified that he believes his truck has air bags, but that he is not certain and admitted that if it does, they did not deploy during the Accident. Mr. Vaughn further admitted that he did not go to the emergency room after the accident, and did not see a doctor until 46 days after the Accident.

Barbara Vaughn testified at trial. She and Mr. Vaughn have been married for 35 years. Mrs. Vaughn testified that she has a tenth grade education and that she does the secretarial work for Vaughn Equipment, answering phones, preparing invoices, and paying bills. Mrs. Vaughn testified that since the Accident,

there's days that [my husband] can't work at all, and then there's days that he'll work part of the day and then he can't work anymore that day. He just - - most of the time he'll come in the office. We used to have a couch, and he'd lay down or sit down, you know, just stay there.

Mrs. Vaughn testified that after the Accident, there were entire weeks when her husband would miss work. Mrs. Vaughn testified that the workers' comp injury did not stop her husband from working and stated: "Well, I mean, it slowed him down, but he still worked." However, when asked if her husband could put in a full day's work after the workers' comp injury, Mrs. Vaughn admitted: "Well, no, he didn't work all the time, but he was there every day." Mrs. Vaughn testified that her husband is a salaried employee who gets paid as long as there is money coming through the door of the company. When questioned about her husband's claim for lost wages, Mrs. Vaughn testified: "All

the 1997 is related to a first wreck, so the 1998, I didn't know how to do that, because there were two accidents, so I just quit keeping records."

Mrs. Vaughn testified that her husband built the house they live in and that he used to do most of the outside chores and yard work, but since the Accident, she has to mow and weed-eat the yard. Mrs. Vaughn testified that her husband never had problems sleeping prior to the Accident, but now does have problems sleeping. She stated: "Well, most nights he's up until 1:00 o'clock, and then he goes to bed. He tosses and turns, and, you know, just all over the bed and, you know, just can't sleep or can't lay in one position." Mrs. Vaughn testified that her husband purchased a new mattress and that she moved into another bedroom so he could have the whole bed "so he can relax better …." Mrs. Vaughn testified that she has been sleeping in a separate bedroom for four or five years now. Mrs. Vaughn testified that she and her husband have not taken a vacation since the Accident. She testified that prior to the Accident, they tried to take a week-long vacation every year.

William Carl Dyer, Jr., M.D. is an orthopaedic surgeon who treated Mr. Vaughn both before the Accident and after it. Before the Accident, Dr. Dyer had treated Mr. Vaughn for several things including the 1989 workers' comp injury. Dr. Dyer testified about several of Mr. Vaughn's visits prior to the Accident. Five years prior to the accident, Dr. Dyer gave Mr. Vaughn an impairment rating of "25 percent permanent physical impairment and loss of physical function to the body as a whole." Dr. Dyer testified that when he treated Mr. Vaughn on December 12, 1991, Mr. Vaughn had a 50 percent range of motion in his back. Dr. Dyer further testified that in January of 1992, Mr. Vaughn began wearing a back brace for back problems. Dr. Dyer testified that on his January 9, 1992 visit, Mr. Vaughn was having pain in the interscapular area, between the shoulder blades. Dr. Dyer also testified that on May 12, 1992, "[Mr. Vaughn] had marked stiffness in the neck, dorsal spine, lumbar spine, and moved slowly and very deliberately. He had difficulty getting on the exam table because of discomfort …." On June 16, 1992, Dr. Dyer noted that Mr. Vaughn had osteophytes about the dorsal spine, "a process which usually occurs as a result of arthritis." On June 16, 1992, Dr. Dyer gave Mr. Vaughn a new impairment rating of

> 26 percent impairment due to flexion loss, 20 percent extension loss, 36 percent
> impairment to the finger as a whole. And actually, I said that I feel he has approximately 5 percent permanent physical impairment and loss of physical function to the body
> as a whole as a result of persistent pain, restricted range of motion, and I feel this is most likely directly a result of his [workers' compensation] injury.

Dr. Dyer testified that on August 18, 1992, Mr. Vaughn told Dr. Dyer that when he sits down at night he becomes so stiff that he can hardly move. Dr. Dyer further testified that he believes that Mr. Vaughn's workers' comp injury completely cleared up prior to the Accident because Mr. Vaughn told him that it had completely cleared up.

Dr. Dyer also testified that when Mr. Vaughn came to see him on February 5, 1997, Mr. Vaughn gave a history of being involved in an automobile accident on December 20, 1996, and having been treated in the emergency room and given Naprosyn, Darvocet, and muscle relaxants. Dr. Dyer testified that his records of that visit state:

On examination the patient noted to have about 90-percent range of motion of the cervical spine.…X-rays, multiple views of the cervical spine reveal the patient to have some degenerative disc disease in three intervertebral discs, narrowing in osteophyte formation. My impression at that time was cervical strain, acute and degenerative disc disease of the cervical spine. Advised the patient at this point that he should take Relafen, 500, two a day. He is to return in two to three weeks.

Dr. Dyer explained that degenerative disc disease means "that the disc between the vertebral bodies, in the neck in this situation, were deteriorating …." Dr. Dyer testified that a finding of degenerative disc disease is interchangeable with an arthritic condition and that Relafen is an arthritis medicine.

Dr. Dyer's testimony was that he has treated Mr. Vaughn for his neck injury in excess of 100 times since the Accident. Dr. Dyer stated:

[Mr. Vaughn] would continue to have problems and he would have what we called exacerbations and remissions. He'd get a little bit better and we'd treat him and he'd seem to take off, and then he'd have a setback, and this was pretty much the history of the way these things go, with exacerbations and remissions, and rarely do people get completely well once they've had an injury like this.

Dr. Dyer further stated:

Well, it became evident as time progressed, and along with the fact that the natural history of this disease process is not for it to ever get back to the normal state, that he was continuing to have problems and it was probably going to follow this. So it was into the treatment that we noticed that he was following the path that we would have expected, possibly not in the degree of the severity or whatever, but he still continued to have significant problems with exacerbations.

Dr. Dyer testified that on August 21, 2003, he assigned Mr. Vaughn a rating of

approximately 18 percent permanent physical impairment and loss of physical function to the body as a whole …. He has restricted range of motion of about 50 percent of the cervical spine in all ranges. He's noted to have marked atrophy of the paraspinous muscles. He has chronic pain in the neck. … He lives with chronic pain on a day-to-day basis. I felt he had 4 percent permanent physical impairment and loss of physical function to the body as a whole, … which severely hampers the patient in his ability to perform ordinary occupational activities as a tractor mechanic. I feel the patient will need additional care. I feel it is quite possible that he may need to have surgery before all is said and done because of the chronicity of the problem and protracted pain.

When questioned regarding possible surgery, Dr. Dyer stated that "some people need to have cervical disc excision and cervical fusion. However, that is not without some problem, and most people do not have to have the surgery."

Dr. Dyer testified that his record of Mr. Vaughn's January 6, 2004 visit again refers to a permanent impairment as a result of the neck injury. Dr. Dyer then testified:

It was 18 to 20 percent to the body as a whole as it related to the cervical spine, and I did not add that 4 percent permanent physical impairment loss of physical function to the body as a whole as it related to class I pain, which should be added to that.

Dr. Dyer also testified that the total permanent impairment that Mr. Vaughn has as a result of this accident should be 29 percent, 25 percent plus 4 for the pain and opined that this is a permanent rating. Dr. Dyer explained that the percentage of impairment he has assigned to Mr. Vaughn has differed over time because "[h]is impairment is as a result of exacerbation of these problems with time and with activity." Dr. Dyer testified:

Well, [Mr. Vaughn] has been unable to perform his ordinary occupational activities. His ability to - - the speed with which he can perform certain activities has been decreased. The total volume of work that he can accomplish has been markedly decreased, according to what he has to say, as a result of the pain and discomfort that he has, as well as the stiffness. So he's really been significantly impaired.

Dr. Dyer admitted:

I have only to accept the history that [Mr. Vaughn] gives me, and I have to act on that history. I have no reason to question the accuracy of the history, and with that in mind, I had no reason to disbelieve that the mechanism of his injury was any other than what I testified.

When asked if it is important for a patient to give an accurate history, Dr. Dyer stated: "It's important that he give me a history, which I have to accept as being accurate." Dr. Dyer testified that as far as he knew, Mr. Vaughn was having no problems performing his work-related functions prior to the second accident. However, Dr. Dyer testified that Mr. Vaughn's injuries received in the Accident "decreased his ability" to work because "[h]e was limited by pain."

Mr. Vaughn admitted that he went to the Chattanooga Outpatient Center on February 27, 1991, prior to the Accident. At the Chattanooga Outpatient Center, Mr. Vaughn filled out and signed some paperwork including one sheet upon which he handwrote: "Chief complaint, back and neck pain running out in left shoulder." However, Mr. Vaughn testified at trial that, despite what he had written at the time, the pain he was experiencing at that time was really not in his neck. Mr. Vaughn stated: "I could have made an error." In addition, Dr. Dyer's records show that Mr. Vaughn visited Dr. Dyer's office on May 12, 1992, for treatment, but Mr. Vaughn denied this visit. Dr.

Dyer's records of the May 12, 1992 visit stated that Mr. Vaughn complained of neck pain. Mr. Vaughn testified that he doesn't remember anything about neck pain and that he cannot remember anything about that day.

After trial, the jury reached its verdict and the Trial Court entered judgment on October 13, 2004, on the verdict. The jury found John Doe 100% at fault for the accident, but found that Mr. Vaughn received no personal injuries in this accident. The jury awarded Plaintiffs zero damages for personal injuries and zero damages for loss of consortium. The Trial Court taxed costs against John Doe up to September 16, 2003, the date John Doe filed his Offer of Judgment. The remaining costs were taxed against Plaintiffs.

Plaintiffs filed a Motion for Suggestion of Additur or in the Alternative New Trial, which the Trial Court denied by order entered November 16, 2004. In the November 16, 2004 order, the Trial Court specifically found "that the jury's verdict in the above-styled action was within the range of reasonableness and was supported by the evidence adduced at trial …."

On November 4, 2004, Ms. Cunningham filed a motion for discretionary costs. Ms. Cunningham had made an offer of judgment on October 16, 2003. By order entered December 2, 2004, the Trial Court ordered Plaintiffs to pay Ms. Cunningham's discretionary costs "in the amuont of $565.15, this amount representing those costs incurred by Ms. Cunningham after she made an offer of judgment on October 16, 2003 …."

John Doe filed a motion for discretionary costs on December 10, 2004. By order entered January 4, 2005, the Trial Court ordered Plaintiffs to pay John Doe's discretionary costs "in the amount of $666.91, the same being costs incurred subsequent to John Doe's Offer of Judgment which was made on September 16, 2003 …." Plaintiffs appeal to this Court.

## Discussion

Although not stated exactly as such, Plaintiffs raise five issues on appeal: 1) whether there was material evidence to support the jury's award of zero damages to Plaintiffs; 2) whether the Trial Court erred in failing to grant an additur, or in the alternative, a new trial; 3) whether the Trial Court erred in ordering Plaintiffs to pay court costs accrued after September 16, 2003; 4) whether the Trial Court erred in ordering Plaintiffs to pay Ms. Cunningham's discretionary costs; and, 5) whether the Trial Court erred in ordering Plaintiffs to pay John Doe's discretionary costs.

"Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d). As our Supreme Court has explained:

> It is the time honored rule in this State that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence or to decide where the preponderance lies, but are limited to determining whether there is material

evidence to support the verdict; and in determining whether there is material evidence to support the verdict, the appellate court is required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary. Having thus examined the record, if there be any material evidence to support the verdict, it must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury.

*Crabtree Masonry Co., Inc. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978).

We first address whether there was material evidence to support the jury's award of $0 damages to Plaintiffs. Plaintiffs cite several cases including *Dent v. Holt* and *Loftis v. Finch* in which verdicts were overturned because there was no material evidence to support them. *Dent v. Holt*, No. 01-A-01-9302-CV-00072, 1994 Tenn. App. LEXIS 465 (Tenn. Ct. App. Aug. 17, 1994) (vacating the damage award where the jury ignored proof of future medical expenses and pain and suffering), *no appl. perm. appeal filed*; *Loftis v. Finch*, 491 S.W.2d 370 (Tenn. Ct. App. 1972) (reversing the verdict as to the amount of damages that were less than the proven actual damages). Plaintiffs also argue, in part, that the present case is very similar to *Taylor v. Smith*, in which this Court vacated the judgment of the trial court after "[f]inding no material evidence to support an award less than the 'hard-core' medical bills …." *Taylor v. Smith*, No. E2002-01158-COA-R3-CV, 2003 Tenn. App. LEXIS 450, at *10 (Tenn. Ct. App. June 24, 2003), *no appl. perm. appeal filed*. There are some factual similarities between *Taylor* and the case at hand in that both cases involve automobile accidents that occurred while at least one party was stopped at a red light. However, while there was no material evidence to support the verdict in *Dent*, *Loftis*, or *Taylor*, we find there is material evidence to support the verdict in this case.

The evidence shows that Ms. Cunningham, who also was involved in the Accident, suffered no injuries as a result of the Accident. The evidence further shows that the damage to Ms. Cunningham's car consisted of a broken $4 blinker light cover and a scratch or streak of white paint on her car's rear bumper. Both Ms. Cunningham and Mr. Black, who witnessed the accident, testified that it was not a bad accident. Officer Short testified that no injuries were reported at the scene and none of the vehicles involved needed to be towed. The evidence shows that Mr. Vaughn's truck was pushed forward on impact, but was not pushed far enough forward to touch the vehicle in front of him. Mr. Vaughn admitted that the bumper of his truck was bent down as a result of the impact between his truck and Ms. Cunningham's vehicle and testified that he simply went to his shop, put a jack under the bumper, and raised it up. He testified that he does not know how much it cost to repair his truck because he never saw a bill, and no bill ever was produced at trial.

The jury heard Mr. Vaughn admit that he had never completely recovered from his workers' comp injury and still was taking medication for that injury. In addition, Mrs. Vaughn admitted that after the workers' comp injury, her husband "didn't work all the time, but he was there every day." Mr. Vaughn testified that currently, "there is days that I can go in and I can do fair. And then there is days I go in, I can't do near as much. And there is days that I go in I don't do anything.

-11-

I sit around," which is not very different from what Mrs. Vaughn testified to regarding her husband's ability to work after the workers' comp injury but before the Accident. Mr. Vaughn admitted that he had two employees who quit some time after the Accident, that he was unable to replace those employees, and that his shop was not making as much money without employees.

The evidence shows that Mr. Vaughn was not treated in the emergency room after the Accident and did not see a doctor for his complaints until 46 days after the Accident. However, Dr. Dyer testified that when Mr. Vaughn came to see him on February 5, 1997, Mr. Vaughn gave a history of being involved in an automobile accident on December 20, 1996, and having been treated in the emergency room and given Naprosyn, Darvocet, and muscle relaxants. This history given by Mr. Vaughn to Dr. Dyer was not true as Mr. Vaughn neither had been treated in the emergency room nor prescribed those medications, a fact made clear to the jury.

Dr. Dyer testified that five years prior to the Accident, he assigned Mr. Vaughn an impairment rating of "25 percent *permanent* physical impairment and loss of physical function to the body as a whole." (emphasis added). Dr. Dyer testified that he assigned Mr. Vaughn a 29 percent impairment rating, 25 percent plus 4 for the pain, as a result of the Accident. Dr. Dyer also testified that Mr. Vaughn began wearing a back brace for back problems prior to the Accident. The evidence further shows that on August 18, 1992, long before the Accident, Mr. Vaughn told Dr. Dyer that when he sits down at night he becomes so stiff that he can hardly move.

Dr. Dyer admitted that he could only "accept the history that [Mr. Vaughn] gives me, and I have to act on that history. I have no reason to question the accuracy of the history, and with that in mind, I had no reason to disbelieve that the mechanism of his injury was any other than what I testified." In addition, Dr. Dyer testified that "[t]he total volume of work that [Mr. Vaughn] can accomplish has been markedly decreased, *according to what he has to say*, as a result of the pain and discomfort that he has, as well as the stiffness. So he's really been significantly impaired." (emphasis added). Dr. Dyer testified that as far as he knew, Mr. Vaughn was not having problems performing his work-related functions after the Accident but prior to the second accident. Dr. Dyer further testified that he believes that Mr. Vaughn's workers' comp injury completely cleared up before the Accident because Mr. Vaughn told him that it had completely cleared up.

Mr. Vaughn also admitted that he went to the Chattanooga Outpatient Center on February 27, 1991, again long before the Accident, and filled out paperwork stating: "Chief complaint, back and neck pain running out in left shoulder." However, Mr. Vaughn testified that the pain he was experiencing at that time was not really in his neck and stated: "I could have made an error." In addition, Dr. Dyer's records show that Mr. Vaughn visited Dr. Dyer's office on May 12, 1992, for treatment, but Mr. Vaughn denied this visit. Dr. Dyer's records of the May 12, 1992 visit stated that Mr. Vaughn complained of neck pain. Mr. Vaughn testified that he doesn't remember anything about neck pain and that he cannot remember anything about that day.

The jury was free to find, and clearly they did, that Mr Vaughn had suffered no damages as a result of the Accident. Witness credibility determination is the responsibility of the

jury, and this Court will not substitute its judgment for that of the jury as to witnesses' credibility. Based upon all the evidence presented to the jury, the jury made its determination that Plaintiffs' testimony was not credible.

Taking the strongest legitimate view of all the evidence in favor of the verdict, assuming the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and discarding all to the contrary, as we must, we find that there was material evidence to support an award of zero damages. We, therefore, affirm on this issue.

We next consider whether the Trial Court erred in failing to grant an additur, or in the alternative, a new trial. Acting as the thirteenth juror, a trial court is empowered to set aside a jury verdict and order a new trial. If a trial court determines that the amount of the verdict is excessive or inadequate, it may suggest a remittitur or an additur in lieu of granting a new trial. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 718 (Tenn. Ct. App. 1999). This procedure avoids the expense and delay of conducting a new trial. *Id*. Here, the Trial Court approved the jury verdict.

> However, when a trial court approves a jury verdict, appellate courts may only review the record to determine whether it contains material evidence to support the jury's verdict. *See* Tenn. R. App. P. 13(d); *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994); *Whitaker v. Harmon*, 879 S.W.2d 865, 867 (Tenn. Ct. App. 1994). Appellate courts do not reweigh the evidence and consider where the preponderance lies. Instead, they determine whether there is any material evidence to support the verdict, and, if there is, they must affirm the judgment. *See Reynolds v. Ozark Motor Lines, Inc.,* 887 S.W.2d at 823; *Pullen v. Textron, Inc.*, 845 S.W.2d 777, 780 (Tenn. Ct. App. 1992).

> The jury bears primary responsibility for awarding damages in a personal injury action, followed closely by the trial court in its role as thirteenth juror. *See Coffey v. Fayette Tubular Products*, 929 S.W.2d 326, 328 (Tenn. 1996); *Sholodge Franchise Sys., Inc. v. McKibbon Bros., Inc.*, 919 S.W.2d at 41..(sic) When a trial court approves a verdict awarding damages in a personal injury action, our review is subject to the rule that if there is any material evidence to support the jury's award, it should not be disturbed. *See Hunter v. Burke*, 958 S.W.2d 751, 757 (Tenn. Ct. App. 1997).

*Overstreet*, 4 S.W.3d at 718.

In its November 16, 2004 order, the Trial Court approved the jury's verdict and specifically found "that the jury's verdict in the above-styled action was within the range of reasonableness and was supported by the evidence adduced at trial …." As fully discussed above,

there is material evidence to support the jury's verdict and award. Therefore, we will not disturb the verdict and find no error in the Trial Court's refusal to grant an additur or a new trial.

We next consider whether the Trial Court erred in ordering Plaintiffs to pay court costs accrued after September 16, 2003. Rule 68 of the Tennessee Rules of Civil Procedure provides, in pertinent part:

> At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party for the money or property, or to the effect specified in the offer, with costs then accrued.…If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree shall pay all costs accruing after the making of the offer.…

Tenn. R. Civ. P. 68.

John Doe filed an Offer of Judgment on September 16, 2003. The judgment obtained by Plaintiffs of zero damages is not more favorable than John Doe's offer. As such, under Tenn. R. Civ. P. 68, Plaintiffs "shall pay all costs accruing after the making of the offer.…" Tenn. R. Civ. P. 68.

Plaintiffs argue, in part, that the award of court costs was inappropriate because the jury's verdict of zero damages was "totally inadequate and against the great weight of the evidence …" and that the award should have been more favorable than the offer of judgment. As we have already held that there was material evidence to support the jury's verdict and have fully affirmed the jury's verdict, we will not belabor this point. We affirm the Trial Court's order requiring Plaintiffs to pay court costs accrued after September 16, 2003.

We next consider whether the Trial Court erred in ordering Plaintiffs to pay Ms. Cunningham's discretionary costs. In pertinent part, Rule 54.04 of the Tennessee Rules of Civil Procedure provides:

> **54.04.   Costs. –** (1) Costs included in the bill of costs prepared by clerk shall be allowed to the prevailing party unless the court otherwise directs, …
> (2) Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion. Discretionary costs allowable are: reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions or trials, reasonable and necessary interpreter fees for depositions or trials, and guardian ad litem fees; travel expenses are not allowable discretionary costs. Subject to Rule 41.04, a party requesting discretionary costs shall file and serve a motion within thirty (30) days after entry of judgment.…

-14-

Tenn. R. Civ. P. 54.04. Thus, we review a Trial Court's decision to award discretionary costs for abuse of discretion. *E.g., Massachusetts Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 32 (Tenn.Ct. App. 2002).

Our Supreme Court discussed the abuse of discretion standard in *Eldridge v. Eldridge*, stating:

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made." A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

Appellate courts ordinarily permit discretionary decisions to stand when reasonable judicial minds can differ concerning their soundness. *Overstreet*, 4 S.W.3d at 709. A trial court's discretionary decision must take into account applicable law and be consistent with the facts before the court. *Id*. When reviewing a discretionary decision by the trial court, the "appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision." *Id*.

Plaintiffs argue, in part, that they were the prevailing party because Mr. Vaughn was found to be 0% at fault for the Accident and, as such, it was improper for the Trial Court to award discretionary costs against them. However, Ms. Cunningham also was found to be 0% at fault for the Accident. As such, Ms. Cunningham successfully defended the suit against her and prevailed against Plaintiffs. Ms. Cunningham was certainly a prevailing party and was entitled to discretionary costs. We find no abuse in the Trial Court's award ordering Plaintiffs to pay Ms. Cunningham's discretionary costs.

Finally, we consider whether the Trial Court erred in ordering Plaintiffs to pay John Doe's discretionary costs. In pertinent part, Rule 54.04 of the Tennessee Rules of Civil procedure provides that " a party requesting discretionary costs shall file and serve a motion within thirty (30) days after entry of judgment.…" Tenn. R. Civ. P. 54.04. The phrase 'entry of judgment' is defined in Tenn. R. Civ. P. 58 as:

> Entry of a judgment or an order of final disposition is effective when a judgment containing one of the following is marked on the face by the clerk as filed for entry:
> (1) the signatures of the judge and all parties or counsel, or

(2) the signatures of the judge and one party or counsel with a certificate of counsel that a copy of the proposed order has been served on all other parties or counsel, or

(3) the signature of the judge and a certificate of the clerk that a copy has been served on all other parties or counsel.

When requested by counsel or pro se parties, the clerk shall mail or deliver a copy of the entered judgment to all parties or counsel within five days after entry; notwithstanding any rule of civil or appellate procedure to the contrary, time periods for post-trial motions or a notice of appeal shall not begin to run until the date of such requested mailing or delivery.…

Tenn. R. Civ. P. 58.

The judgment on the jury's verdict was marked on the face by the clerk as filed for entry and contained the signature of the trial judge and a certificate of the clerk that a copy had been served upon all parties or counsel on October 13, 2004. John Doe filed a motion for discretionary costs on December 10, 2004, well outside the thirty day period after the entry of judgment.

We acknowledge that some case law exists suggesting that the filing of a motion for a new trial tolls the time for the filing of a motion for discretionary costs. *See The Alison Group, Inc. v. Ericson*, No. W2003-02973-COA-R3-CV, 2005 Tenn. App. LEXIS 327, at *13 n.6 (Tenn. Ct. App. June 3, 2005) (finding that a motion for discretionary costs filed prior to "a final order on Appellants' [motion for new trial]" was timely filed.), *appl. perm. appeal denied Oct. 24, 2005*; *Dulin v. Dulin*, No. W2001-02969-COA-R3-CV, 2003 Tenn. App. LEXIS 628, at *21 (Tenn. Ct. App. Sept. 3, 2003) (stating: "Thus, in accordance with our decision in *Ashford*, we find Mother's motion [for discretionary costs] was timely filed."), *no appl. perm. appeal filed*; *Ashford v. Benjamin*, No. 02A01-9311-CV-00243, 1994 Tenn. App. LEXIS 706, at *4-5 (Tenn. Ct. App. Dec. 6, 1994) (stating: "Once a motion for new trial is filed, the judgment is suspended and prevented from becoming final pending disposition of the motion. The trial court's jurisdiction is preserved. … As Ashford's motion to assess costs was filed within thirty (30) days after [entry of the order denying a new trial], we hold it timely pursuant to Rule 54.04(2) T.R.C.P." (citations omitted)), *no appl. perm. appeal filed*.

With all due respect, we disagree with these cases because Rule 54.04 clearly states that a motion for discretionary costs shall be filed "within thirty (30) days after *entry* of judgment.…" Tenn. R. Civ. P. 54.04 (emphasis added). Rule 58 clearly provides the definition of what constitutes "entry of judgment," and the judgment in this case was entered in accordance with that rule on October 13, 2004.

As John Doe did not file his motion for discretionary costs within thirty days of entry of the judgment, we hold it was error to award John Doe discretionary costs. We vacate that portion of the Trial Court's order awarding John Doe discretionary costs.

## Conclusion

The judgment of the Trial Court is affirmed, as modified by vacating the award to John Doe of discretionary costs, and this cause is remanded to the Trial Court for collection of the costs below. Exercising our discretion, the costs on appeal are assessed one-half against the Appellants, Kenny Vaughn and wife, Barbara Vaughn, and their surety, and one-half against the Appellee, John Doe.

_____
D. MICHAEL SWINEY, JUDGE